May it please the Court, I'm going to reserve four minutes for rebuttal. In this case, employer only offers one defense as to why the wages at issue were not owed. It's a condition precedent defense. The condition precedent effectively says that the employee must be employed 90 days after the close of the relevant fiscal quarter, a fiscal quarter also naturally being 90 days. Counsel, let me interrupt you to turn to what I think may be dispositive here. So I understand we have this chart 1%, 10%, 20%. The question is, are these quotas that have to be met, right, in order to receive the credit that you get for achieving a quota? And so take my hypothetical of, let's say somebody in the first quarter gets one half of 1%. Do they get, that's all they get in the first quarter. In that first quarter, are they credited that one half of 1%? That's correct, Your Honor. I think the chart is a great example of that. The chart, if you're going to use a chart for illustrative purposes, you're obviously not going to get a percentage point. So I believe that the employer is going to try to argue that the 1% suggests that there is a floor of 1%, but the deposition testimony of Mr. Abboton, the only fact witness that the employer offers in this case, says that if you sell $1 more, you're going to get a proportional increase to your incentive payment. Right. And so that's what I wanted to ask you about. So this is not, doesn't appear to be covered in the deposition, and you all haven't really talked about this in the briefs, but I'm looking at, do you have the record in front of you, 5 ER 360? 5 ER 360. Yeah, if you could turn on that, please. And I'll tell you what this is. This is the report summarizing the, in this fiscal year, the each quarter's results and how we did. And I'm particularly interested in the first quarter at the very top of the page of 5 ER 360. Sorry, that doesn't need this slide. Binder management, 5 ER 360 is number 5. I'm sorry, I'm taking up your time here, but this is an important question about, I'm digging through this and I, but let me just summarize the situation here. You'll find it, which is to say it shows in the first quarter that his yearly attainment, you know, we had the TCV and the ABR, right? And one is 15.9% and the other 17.49%. So he didn't get the, so at the end of the first quarter, he didn't hit the 20% mark on the chart, right? He didn't hit that. But my reading of this is that he actually got compensated at the end of the first quarter, seven, the 60 40 mix between approximately 16%. That's my reading of that. That was the compensation he received for the first quarter, even though he didn't hit the 20% quote. Is that correct? That is correct. And Mr. Aviton's testimony also corroborates that Mr. Larson has been paid out even when he did not achieve the I believe it goes through three, eight, nine, which are the actual itemization of the SICP payments that were made to Mr. Larson. Yeah, I couldn't understand this. So the highlighted, it's fair. It's fair there. So for example, on the first page, I think this is the best example. This is five er 376. Mr. Larson was paid out $5,212. Right. But does that correspond with my I get that he was paid a certain amount, but does that correspond to in other words, if it's a quota of one way to read this, right? This document is in that first quarter. If you don't hit 20%, you only get paid up to 10%. That was what you met. You met a quote of 10%. And this is what I think the other which your opponent is arguing. You only get the 10%, right? Because you didn't meet the 20%. But so my point is, is that if we have a 10, 20, 30, this is not actually a quota. This is just sort of the it's a it's a goal. It's just a reflection of percentages, but it doesn't actually matter what percentage you actually, like I said, it doesn't matter what what percentage you actually hit in any given quarter, you'll be paid whatever that percentage is, even if it falls between, say, those benchmarks of 10 and 20. That's exactly correct. The quota achievement as the term is used is essentially a calculator. So there's no there's no contingency built into this at all. That's correct. And in fact, there was in the 2019 agreement, which is not the agreement before the court. So that language was removed. And Mr. Abbott on testified that, yeah, there used to be a threshold requirement where the employee did have to meet some metric in order to get paid. But that's not the case in the present year's agreement. I just couldn't tell from this record that he actually got paid out something approximately 16 percent in that first quarter. Right. Because he fell between the 10 and 20 percent fresh benchmarks. And under one, if these are just quotas and you only hit 16 percent, then you'd only get 10 percent. And presumably, when you hit 20 percent in the next quarter, then you'd get the balance. But here he got 16 percent. So he didn't meet the 20 percent threshold. He still got it. That's exactly correct. And what brings on the appeal? There are a couple other issues I'd like to address. I mean, again, there's a limited scope here on appeal. There's no question that the employee made all the phone calls, closed all the deals and the clients actually paid. The only condition precedent that the employer is relying on is this requirement that he works 90 days past the close of the quarter. The courts will use interchangeable terms. Vested is akin to being earned. Right. So that's when the employee has the right to the payment. So if we imagine an hour statute, we keep saying earn, but you'd agree the statute says do an owing. That's the language we should use. That's the language of ORS 652140. That's correct. The question is, when did Mr. When did the employee earn? And if he earned it, then it can't be divested. The employee brings no argument today that an employer is prohibited from saying, OK, you've earned it and we'll pay you 90 days after the close of the quarter. Sometimes there's calculations that need to be run. Sometimes the clients don't pay promptly. So those issues are totally fine. But the employer's position today is that this condition precedent deprives him of what was earned. And that's where the Martin case enters the conversation. The Martin case upholds a long held doctrine in Shulstead, which talks about once the employee does what they're required to do, the compensation vests and Martin discusses the distinction between bonus vesting and commissions. That's the whole point of Martin. If it's a commission, that is the wage at issue, which we argue it is, then the employee vests the right to that compensation at the time that the sale is procured. And I will now go into the Martin factors. Martin raises three and a half issues for the court to analyze when making a determination about whether the incentive payments in this case are bonuses or commissions. The first is whether the transaction itself is what keyed the payment. Keyed, in my opinion, is an unfortunate term. You can look up the dictionary definition. It's not particularly helpful to either side. But the context of Martin makes it clear that what they're looking at is, to use a metaphor, what unlocks it, the key unlocks it. And in the record, on 5 ER 364, we've put in the exact sales that represent the incentive payments that are the only factor that led to the determination of the employee's wages. So, and then we have Mr. Abiton's testimony, which I won't repeat in full, but it suggests that if an employee sells a dollar more, then they're going to get a proportional increase. He talks about how the compensation contract is essentially a calculator and that DXC has the calculators that it will take the sales and go through the ABR and TCV concept and find out exactly what that number is. At the trial court, we offered declaration evidence that despite all of the complicated math, it boils down to 0.99% below the goal. And then it increases to 1.35% after the quota achievement. And we expect that the employer will argue that that makes a difference. There's absolutely no contingency here. Correct. All right. Correct. And that is a critical analysis for the Martin case. In the paragraph where it makes its holding, it specifically says in the Martin case, there was a contingency. I'll also point out that in Martin, the employee was only required to work till the end of the quarter, whereas in our case, the employee is not only required to work till the end of the quarter, which Mr. Larson did, he resigned after the end of the quarter, but to go to the next quarter. So in its briefing, the employer argues, well, Mr. Larson could have worked through the end of Q4 to get his Q3 payments, but the ball that they're hiding is that then he would have to work Q1 of the next fiscal year to get his Q4 payments and so on and so forth, and he will always be deprived of that final payment. Is there anything in the record here that speaks to how the company treated personnel who, let's say, you know, that they only did their 60 percent, they got their base salary, and they just decided to take the, you know, they didn't want to work and try to earn the 40 percent of their standard compensation. Would that have been considered substandard performance? Is that in the record anywhere here? I didn't see it. Well, if somebody just decides, I'm happy with my base salary, I don't need the 40 percent, I'm just not, would that have been tolerated? There's nothing directly in the record to answer that, but I think the fair inference would be that if you're a salesperson and you're making no sales, that you're going to be terminated. But if you make one dollar, then it kicks you into getting compensated some tiny percentage. That's correct. That's correct. And he made more than a dollar. Correct, yeah. Mr. Larson was a good salesperson. He did well. And from there, the only question is what is the payment that should be calculated. But yes, Mr. Larson made more than one dollar of sales. Some of the cases talk about is it a commission or is it a bonus? It seems from the language of what makes you eligible, it's not a bonus because you're expected to at least earn something, right? That's correct, and I'll answer this question and then reserve unless there's additional questions. But the only case that talks about the difference between a commission and a bonus is Martin. I suppose Thompson dabbles with it and Walker dabbles with it. But, yeah, the other two factors that we haven't quite addressed yet are whether the compensation references something above and beyond. And if you're compensated for making one dollar of sale, I think it's fair to say that that's not above and beyond. The other final factor is regularity. And, you know, the Martin Court doesn't go into depth on that. I think there's two ways to look at it, how frequent are the payments are. If you're looking at frequency, I think that's neutral for employee and employer. It was quarterly. The payment frequency in Martin was also quarterly. But the 60-40 split demonstrates that it's a regular part of the employee's compensation. We have this dichotomy between whether regularity means timing or whether regularity means normal and typical, and we don't have a clear answer from Martin. That's correct. And I'll reserve unless there's additional questions for now. Thank you. Go way down. Now we can see. Yeah. There we go. All right. Your Honors, may it please the Court and may I, on behalf of the appellees, because the law is so well settled on the issues presented in this appeal, the appellant has sought to confuse or distract the Court from the issues that are actually here. And the issues here are straightforward. The one thing that the appellant didn't address that I'd like to address before we get into the bulk was he does have a motion for certification of questions to the Oregon Supreme Court. So I'd like to address that briefly first and then move to the two key reasons why the district court's decisions on the cross-filed motion for summary judgment should be upheld. Appellant's questions for certification are improper for three reasons. First of all, under this court's precedent, there's a presumption against certifying a question to the state Supreme Court after the federal court has issued an adverse decision. That's exactly what's happened here. Appellant lost at the district court on summary judgment, and now he is seeking to certify questions after the fact. He could have certified these questions before the district court. He chose not to do that. In fact, he relied on the same case law that he now asserts is insufficient to decide this case, which was the Martin case. For that reason alone, the motion for certification should be denied. With respect to the actual questions that the appellant proposes for certification, appellant's first question is whether an employer can require employees to forfeit their last quarter of commissions if they leave their employment. That is a question that would not be determinative of any of the issues on this appeal, and regardless, there's ample controlling authority under Oregon law on this question. The Oregon Supreme Court has said that it will exercise its discretion to certify a question only if there's no controlling precedent from the Oregon Supreme Court or the Court of Appeals. And the courts of Oregon have repeatedly held that employers and employees may agree when compensation, including commissions, become due and owing or due and payable. With respect to the appellant's second question for certification, which was whether under Oregon law the compensation at issue here is a bonus or a commission, that asks the court to decide a factual issue. The Oregon Supreme Court has also said that it will only accept certification of questions if they are questions of law, and that is not a question of law. Therefore, that question should also be denied. So if there are no questions regarding the motion for certification, I will turn now to the issues on appeal. So as I mentioned at the outset, the appellant would like the court to get mired down in the labels for the compensation, i.e., is it a bonus or is it a commission, and applying hypothetical calculations to attempt to, albeit incorrectly, show how the compensation plan works. However, these are not the issues that are actually relevant on appeal. This court, the issue that's before this court today, is to decide whether under Oregon wage statutes a conditioned precedent is allowed in a compensation plan that an employer and an employee have agreed upon. And based on the relevant Oregon statutes and the well-settled Oregon case law interpreting those statutes, the answer is yes for two key reasons. First, Oregon law clearly states that compensation is not due, owing, or payable under Oregon's wage statutes when a conditioned precedent to payment has not been satisfied. So we've talked a little bit about the Martin case. We've talked a little bit about the Walker case. Those cases both had sales incentive compensation plans that are virtually indistinguishable from the plan at issue here. In Walker, Oregon's- That's not correct. Martin, there was a contingency built in, but we don't have any contingency here. Yeah, but there's nothing- I mean, do you agree with what your colleague just said, that there's a dollar-for-dollar payment? Is there any dispute about that? I do dispute that it's a dollar-for-dollar. Can you explain that? Yes, absolutely. So under the plan, the targeted total compensation, not the guaranteed, is made up of the base salary and a potential bonus pool. That bonus pool is calculated based- Well, I mean, you call it a bonus pool. Let's just call it a pot of money or whatever because by saying it's a bonus, you kind of answer your own question. Yes, agreed. Pot of money is the better, and that number is determined based on a percentage of the base salary. So the pay mix in this compensation plan was 60-40, 60% base salary, 40% of this pool. That pool is 40% of the base salary. So it's not a dollar-for-dollar because when he reaches a percent of quota at the end of the quarter, they take that number and determine what number that is of the pool. So let's talk about that. I asked your colleague to turn to 5ER360, and so I understood you're right. So if, in fact, so in the first quarter, he hit approximately 16%, all right? So you have this chart, 10, 20, 30, 40, but he was paid 16% even though he didn't hit 20%. So how is there any contingency here? One thing, if the company had said, oh, you didn't hit 20%, so we're holding back that 6% above 10 because there's 10 in the chart, right? And in the next quarter, if you hit 20, we'll pay, we'll true it up and give you that 6% plus the additional 40 you earned in the second quarter. But that didn't happen here. Yeah, I think the distinction here is there's nothing in the law, in the Martin case, that says there has to be that contingency. There's nothing that says that they have to meet the quota in order to get money under the plan. There's nothing in any of the case law that suggests that, that that's a requirement, that there be that contingency. Okay, counsel, if I could ask you a different question. Is there anything in our case law either way on the question whether something, if it's a commission, is earned at the time a sale is made? So the Martin case would imply that, that the commission is earned at the time. The distinction here that is, that appellant has not recognized is that appellant, the Martin case was a breach of contract case. This is not a breach of contract case. They were clearly referring to the wage and the wage statutes. It's very clear from the context that they made those a reference to the Oregon wage laws. They made reference, but the complaint itself was not brought under those wage statutes. It was a breach of contract action, unlike Walker, which was brought under the wage statutes here. So there's a distinction between the two. Right, but it's clearly, you know, in the background, they were aware of it and they referred to it. They referred to Oregon law on this. Oregon common law with respect to determining breach of contract actions. So what you did refer to the word bonus before, and that's because we have focused on both bonus and commissions, and in Martin it makes some statement to the effect that a bonus is where you do something above and beyond expectation. If here he gets money, if he goes for $1, how is that considered above and beyond? The whole plan itself is an incentivized plan to go above and beyond, to hit a higher percent of your quota, to achieve more sales, to go above and beyond. The plan itself actually has a multiplier. If he hits 100% of the quota, everything above 100% isn't 100% for 100%. It actually has a multiplier factor. So there is incentive to go above and beyond. The whole purpose of this plan is to incentivize. But to get to that point, you need to have 100% of the quota, so to speak? Correct, to have the multiplier. It's a bonus, but that doesn't really answer what happens if you're under. That's where I'm having the kind of intellectual struggle with your argument. So I think the distinction that appellees make here is that it doesn't matter if it's a bonus or a commission under Oregon law. Oregon law says that you can have a conditioned precedent to payment, and that is the issue that needs to be decided, and which has been decided. It was decided in Walker. In a different kind of case, breach of contract, it was decided in Martin that you can have a conditioned precedent to payment. If you're working under a normal wage and hourly situation, you can't impose a conditioned precedent that says, okay, I work all day, I work eight hours, I'm getting paid $15 an hour. You can't say, and you must work two more days to get that. That would be illegal, right? I would say that that would be illegal. I think the distinction here is that there's an agreement that was agreed to by the parties. The appellant agreed to a new sales incentive compensation plan with these conditions precedent no less than three times. Can I ask you in the real world what would have happened to a salesman who only decided just to receive their base salary and not do anything to try to achieve that 40% that's part of their standard of compensation? I think in the nature of sales, you are not always going to have a good quarter. You're not always going to have a good year. So there's nothing in the record to say that if he did not perform, he was going to be let go, but that's the nature of sales. I couldn't give you an answer on that. Just going back to pointing out the key fact that the sales incentive compensation plan here is lawful under both Walker and Martin is because it pays sales employees, like the appellant, an amount above base salary measured against this annual sales target. And it pays that out quarterly against those targets. And that agreement, as was present in both Walker and Martin, requires them to be actively employed. Both Walker and Martin upheld that you can have a provision  in order to receive payment. And so I just want to kind of also expand on the fact that it's not just in commissions, bonuses, whatever you want to call the compensation that Oregon courts have said conditions precedent are legal. We have cases with severance pay, pension benefits, vacation pay. In all of those situations, under the statutes, the Wage and Hour Statutes of Oregon, they have upheld conditions precedent to payment. And I think we've covered this a little bit, but my second point is that applying this law and authority does not depend on how the incentive payments are labeled or how they operate. It's because the statutes and the Oregon courts have made no such distinction. And I have seen nothing from appellant and no judicial or statutory authority citing one. So, therefore, under the clear, longstanding Oregon precedent, in order to receive payment under the agreement at issue, appellant was required to be an active employee at the time the incentive payment was paid. Because he resigned prior to the date of payment, fully understanding the consequences of those actions, which he testified to and which is in the record, that he understood the consequences of those actions, those wages were not due and owing pursuant to the statutes. And similarly, they were not due and payable according to the agreement between the parties. So appellant's argument that relabeling what we call the compensation will change the outcome, it doesn't. Can you point to anything in the record that says if he had earned one-half of 1% in one quarter that he would not have received any compensation for that? Off the top of my head, I don't have anything in the record to point to that. All right. And so if a person hits in the third quarter, they hit 35%, what are they going to get? Are they going to get 30% or are they going to get 35%? They're going to get the 35% of the pool, which is not based. They're going to get 35% in that third quarter even though they didn't hit the 40% in the chart. Correct. So with respect to the argument as a whole, Oregon's wage and hour statutes are clear that employers and employees can enter into agreements as to when the compensation is due and owing or due and payable. The appellant is now asking this court to rewrite Oregon's statutes, which is not the role of this court. Moreover, the well-settled Oregon case law decided under these statutes has reaffirmed the legality of these conditions, President, over and over again with respect to all kinds of different kinds of compensation and with compensation plans that are virtually identical to the plan at issue here. In writing its plan, the appellee relied on well-settled law to establish a compensation plan, and now appellant is asking this court to throw out that law for no reason. The one thing that I did also with the small remaining time I have here want to point out is that appellant has argued that the appellee has to be employed 90 days after. That is not what the plan says. It says payment will be made within 90 days. So that is not a true statement. It's not reflected in the record, and I think that's an important distinction here as well. Can you tell us in practice how often, what was the interval at the end of a quarter? When was the payment made for that quarter in practice? So in this situation, I'll give you a direct example. In this situation, it was paid 42 days after the end of the quarter. For the prior fiscal year, it was paid 42 days after the end of the fiscal quarter. So appellant would have known, based on past practice. Was that the regular payment schedule, approximately 40 days? It varied. It could be up to 90 days, but it might be less than that. It might be more. Almost never more, but I can't tell you, never. But often less, and consistent year over year, depending on the quarter. Counsel, can I ask you a question, please? In terms of how this system works. Let's say someone was like a Cracker Jack salesperson. They knocked the socks off the fourth quarter of the year, and they sold tons of stuff. And if you view it as a commission, however, normally it would be due when the sales were made. But here, the way the contract works, if after making all those sales, the employee was in a car accident and had to just cease work, what would happen on those commissions? So in this case, and it is reflected in the record, there are exceptions that can be made. Before the employee left, he was fully under the understanding that he would not receive his last quarter. He did not stay through when it was paid. He asked for an exception, and the company did not give him that exception based on practice. In the situation that you're giving us. That's hypothetical. I'm giving you, if the company said, we're not going to make an exception for this, what would be the result under the plan? Well, under the plan, our argument is that if we do go down the route of is this a bonus or a commission, this is not a commission. Therefore, it was not earned at the time it was sold, and it would not be paid. Okay, and so, does fairness have anything to do with this case? I tried to make a hypothetical to give you where it would seem unfair to deny commissions. And just for that purpose, I want to know if what seems fair or just has any bearing on the issue we have to decide. While the district court acknowledged this, and I will acknowledge it as well, there is a fairness aspect, but that is not the law. The Oregon courts and the Oregon legislator has come up with this law that they deemed fair for their constituents, and it has, since Walker in 1973, been consistently upheld. So while there is an element of fairness to this, and we all are sympathetic to the appellant's fact, he was a well-paid, over six-figure base salary, highly educated, understood the plan, understood the consequences of the plan, and entered into that agreement knowingly. As the district court said, we don't do cosmic justice in this business. We do justice under law. Correct, yes. With that, I think I'm way over. So if you don't have any other questions... Okay, well, thank you very much for your excellent argument. Thank you. Thank you. In State X. Rel. Nelson, we get the policy statement for the Oregon wage statutes, which goes to the issue of fairness. The policy of the statute is to aid an employee in the prompt collection of compensation due to him and to discourage an employer from using a position of economic superiority as a lever to dissuade an employee from collecting his agreed-upon compensation. To build off of Your Honor's example, if the employee died in that car accident, DXC would not pay them, under the contractual terms, that compensation. If the employee sued, they would be relying on the same condition precedent as a legal position that they are now, absent some unforeseen criteria. So their estate could not sue for the commissions? The estate could certainly file a lawsuit, but the same condition precedent that the employer is arguing today, that would be an issue. The other position from employer that I want to point out in recent argument is on Your Honor's question regarding an hourly employee. The answer to that question was, if there was an agreement, the hourly employee could also be deprived of their pay. And that flies in the face of Oregon law, specifically the Shulstad case. And also just imagine the loophole that that creates and how that would contrast with the policy argument I just read from the Nielsen case. That would be economic leverage from the employer that would have serious implications throughout the Oregon labor market. The increase in percentage argument that was put forth by employer, if we were to imagine a car salesperson who was paid 5% for selling 0 to 10 cars and 10% for 11 to 20 cars, Martin does not punish the employee for having there be some kind of escalated commission percentage. Not to mention the facts of the case are not above the multiplier. The only contingency here, as I understand it, is not whether you received your compensation, it's the amount of the compensation. That's exactly correct. Yeah, the employer's position is that there is a threshold that flies in the face of the record. And yeah, Martin's holding, in essence, is that commissions are now in the same bucket as hourly wages. The provision that the employer relies on is also very different than the cases in the record. Thompson v. Barr, Walker, the Duco Lamb case, Roberts case, those all involved an employee having to work to the end of the year. And then they could retire, quit, or die after that point, but they had done the time and they'll get paid out and they don't need to sink another year in in order to get that. That's the difference in this case. So you'd be like on a hamster wheel. Exactly, exactly. Thanks, counsel. I'm afraid your time is up unless one of my colleagues has questions for you. Hearing none. Thank both counsel for their argument. It's a very interesting case. Very interesting. Okay, so the next case on our argument calendar.
judges: McKEOWN, GOULD, Baker